UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| NICHOLAS HOWELL, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:11-CV-079 JD |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

# OPINION & ORDER

Plaintiff Nicholas Howell sued defendant CSX Transportation, Inc. (CSXT) on February 28, 2011, under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, seeking to recover damages for injuries he sustained as a result of an incident on February 3, 2009, where he was working as a conductor/remote control operator and was allegedly exposed to hazardous fumes and became ill [DE 1]. The discovery period concluded and the bright-line notice was entered on September 11, 2012 [DE 34].

Now pending before the Court are various motions, including CSXT's motion to exclude the expert testimony of Dr. Kamal Chaban filed on May 25, 2012 [DE 27]; Howell's motion to amend the complaint filed on October 12, 2012 [DE 37]; CSXT's motion for summary judgment filed on November 5, 2012 [DE 40]; Howell's motion to expedite a ruling on the request to amend the complaint filed on November 26, 2012 [DE 44]; and CSXT's motion for the Court to summarily rule on its request for summary judgment filed on January 31, 2013 [DE 46]. The motions are fully briefed and ripe for ruling. The Court first considers the request to amend the complaint, the outcome of which may influence the Court's determination on the remaining matters.

**1.      Howell's motion to amend the complaint [DE 37]**

In Howell's original complaint, he alleges that he was "overcome by severe fume inhalation" due to a "tank car that was leaking dangerous and hazardous fumes" as his "locomotive passed through the cloud of leaking hazardous fumes" [DE 1 at ¶ 8-9]. According to his deposition, taken on July 13, 2011, at the time of the alleged incident, Howell was operating the locomotive not from inside its cab, but from outside on the point of the engine [DE 39-1 at 4, 9]. Howell testified that he had no idea where the fumes came from, *id*. at 12, but he did not smell it when he went inside the locomotive. *Id*. at 10.

Yet, two of Howell's supervisors, CSXT Trainmaster Rich Capelle and Terminal Superintendent Nicholas Male, investigated Howell's injury and have a different version concerning the source of the fumes. During Capelle's deposition on October 4, 2011, it was Capelle's recollection that Howell reported a smell coming from inside of the locomotive which made him sick [DE 39-2 at 2-3]. When Male was deposed on October 4, 2011, Male testified that when Capelle notified him of the incident, Capelle stated that Howell smelled fumes inside the cab of the locomotive where Howell was located [DE 39-3 at 2-3]. Male testified that if there was a source of the fumes it was the locomotive, *id*. at 5, 7, despite the fact that the mechanical department inspected the locomotive and did not find anything that would explain the odor. *Id*. at 6-7. In addition, the CSXT reports of the incident reflect Howell reporting that the fumes emanated from inside the locomotive [DE 39-3 at 45; DE 39-4 at 4-5, 18, 21, 28].

Just over a year after the depositions were taken of Capelle and Male, Howell filed a motion to file an amended complaint [DE 37] seeking to allege that not only did the fumes originate from a tank car (as he did in the original complaint), but that in the alternative, the fumes originated from

2

the locomotive. The additional claim would still be asserted under FELA whereby Howell would argue that CSXT was negligent by violating the Locomotive Inspection Act (which does not provide for an independent cause of action, but such a violation would constitute evidence of negligence under FELA). Howell argues that once he became ill from the fumes he was taken to the emergency room at the local hospital and was unable to investigate the source of the fumes. *Id*.

CSXT argues that the request to amend the complaint ought to be denied because the deadline to amend the pleadings passed on June 29, 2011, and a motion made after the time has expired may be granted only if "the party failed to act because of excusable neglect" [DE 38] (quoting Fed. R. Civ. P. 6(b)(1)(B)). CSXT asserts that Howell's explanation is insufficient. *Id*.

Federal Rule of Civil Procedure 15(a)(2) entrusts to the Court's discretion the decision of whether to permit a party to amend its pleading after the initial stages of litigation but before trial, and instructs the Court to "freely give leave when justice so requires." *See Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 480 (7th Cir. 1997). A district court has wide discretion to decide whether to grant a motion to amend a pleading before trial. *Vitrano v. United States*, 643 F.3d 229, 234 (7th Cir. 2011) ("district courts are vested with . . . wide discretion when it comes to evaluating the merits of Rule 15(a)(2) motions to amend; if a motion doesn't pass the sniff test, i.e., reeks of bad faith or dilatory motive, the district court is permitted to deny it and hold the plaintiff to his original complaint"). The Court will generally grant leave to amend unless one or more of three conditions exist: (1) the party seeking amendment has engaged in undue delay or some sort of bad faith; (2) the opposing party would suffer undue prejudice; or (3) the amendment would be futile. *Orix Credit Alliance*, 125 F.3d at 480 (citations omitted). Further, when a plaintiff seeks to amend its pleading after expiration of the trial court's Scheduling Order deadline, as Howell

3

seeks to do here, the plaintiff must show "good cause." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (noting that Rule 16(b)'s good cause standard primarily considers the diligence of the party seeking the amendment). A party generally must offer an explanation—such as excusable neglect—for why it did not seek amendment sooner. Fed. R. Civ. P. 6(b)(1)(B).

The Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993) listed the factors a district court should consider when evaluating a claim of excusable neglect, which include the danger of prejudice to the defendant and the reason for the delay. *Murphy v. Eddie Murphy Prods., Inc.*, 611 F.3d 322, 324 (7th Cir. 2010); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006) ("We have held that *Pioneer* applies whenever "excusable neglect" appears in the federal procedural rules."). More specifically, the "standard for reviewing whether neglect was 'excusable' is an equitable one, taking into consideration relevant circumstances, including (1) the danger of prejudice to the non-moving party; (2) the length of the delay and its impact on judicial proceedings; (3) the reason for the delay (i.e., whether it was within the reasonable control of the movant); and (4) whether the movant acted in good faith." *McCarty v. Astrue*, 528 F.3d 541, 544 (7th Cir. 2008); *see Pioneer Inv. Servs.*, 507 U.S. at 395 (determination of excusable neglect is "an equitable one, taking account of all relevant circumstances surrounding the party's omission."); *see also Commodity Futures Trading Com'n v. Lake Shore Asset Mgmt. Ltd.*, 646 F.3d 401, 405 (7th Cir. 2011) ("invariably when a court announces an 'all relevant circumstances' standard to govern some issue and then starts listing the circumstances, redundancy ensues; we think it a sufficient gloss on 'excusable neglect' that a judge asked to waive or extend a deadline must evaluate the excuse offered by the party seeking the waiver or extension and the

consequences to all persons affected by the granting or denying of it . . . [t]he stronger the excuse and the graver the adverse consequences of rejecting it relative to the adverse consequences to the opposing party if the excuse is allowed, the more the balance leans toward granting").

In the present situation, futility or bad faith are not at issue. The question is whether Howell has established a sufficient reason for his delay in seeking the amendment and whether CSXT would suffer undue prejudice if the amendment were permitted. While the Court agrees with CSXT that Howell's delay in seeking the amendment was lengthy and that Howell's excuse for not amending his complaint sooner is not particularly strong, the Court finds that allowing the amendment is appropriate here after considering the relevant circumstances, balancing the harms to each party, and considering the minimal impact it will have on the judicial proceedings. First, according to the parties' briefs, the source of the fumes is still unclear— when Howell was deposed he indicated he had no idea where the fumes came from, yet he thought they came from outside the locomotive. And despite no defect being found in the locomotive, CSXT's representatives indicate that if there was a source of the fumes it was the locomotive itself, which is what Howell reported on the day of the incident. In fact, one could suppose that it is plausible that the source of the fumes originated from the outside, yet infiltrated the locomotive. In any event, since Howell was immediately taken to the hospital, he was unable to confirm the source of the fumes, and to this day the source is unclear.

CSXT argues that Howell should have sought to amend the complaint earlier because he was aware that the locomotive may have been the source of the fumes since the day of the incident—yet, the same rationale applies to CSXT. That is, on the days immediately following the incident, CSXT

knew that Howell had reported that the fumes came from inside the locomotive. Yet when Howell filed his complaint and was deposed, he indicated that the source of the alleged fumes was not the locomotive, but a leaking tank car. Therefore, Howell's seeking to amend the complaint so that it includes an alternative argument concerning the source of the fumes, should come as no surprise to CSXT. Allowing the amendment now, based on information CSXT had in its possession on the day of the incident, causes them no prejudice. Further, by allowing the amendment, no delay in the proceedings will result since no date has been set for dispositive motions or trial. In fact, should this case go to trial, it is very likely that this 'alternative source' evidence will be introduced anyway, which would then allow the complaint to be amended *even after* trial has started. *See* Fed. R. Civ. P. 15(b)(1) (noting that if at trial, the evidence is not within the issues raised in the pleadings, then the court may permit the pleadings to be amended). The Court finds that given the equitable standard for reviewing whether neglect was excusable, justice so requires the complaint's amendment under the relevant circumstances and for good cause shown.

Accordingly, Plaintiff's motion to amend the complaint [DE 37] is GRANTED. Plaintiff shall file his amended complaint [DE 37-1] as a separate document within 10 days of this order. Should further discovery limited to the additional claim need to be conducted, then either party may file a motion with the Court indicating the basis for further discovery and identifying the specific discovery to be conducted.

**2. CSXT's motion for summary judgment [DE 40], CSXT's motion for summary ruling on the summary judgment motion [DE 46], and Howell's motion to expedite the ruling on the motion to amend the complaint and reset the summary judgment briefing schedule [DE 44]**

According to the parties, if the Court allowed the complaint to be amended, then CSXT intends to file a motion for summary judgment on the newly added explanation concerning the

alternative source of the fumes [DE 44, 45]. As a result, prior to the passing of the response deadline, Howell requested that the Court reset the summary judgment briefing schedule to allow the Court to first rule on the request to amend the complaint [DE 44]. On the other hand, CSXT argues that the Court's ruling on the motion to amend the complaint has no bearing on the summary judgment motion, yet acknowledges that if the Court allows the complaint to be amended, then CSXT would address the new claim in a second motion for summary judgment [45]. CSXT also filed a motion requesting the Court to summarily rule on the motion for summary judgment, arguing that Howell failed to timely respond to the motion [DE 46]. Howell reiterated that it had in fact requested an extension of the briefing schedule prior to the lapse of the response deadline [DE 47].

The Court not only has the discretion to effectively manage its docket, but it has an obligation to do so, while construing and administering the Federal Rules to do substantial justice and to secure the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1, 8(e). In fact, the Seventh Circuit has "repeatedly held that district courts have broad discretion to manage their dockets . . . [i]mplicit in this basic principle is the authority to enforce local rules or practices that enable a district court to manage its docket as efficiently and speedily as possible, particularly where there is no risk of unfair prejudice to the litigants." *A. Bauer Mech., Inc. v. Joint Arbitration Bd. of Plumbing Contractors' Assoc. and Chi. Journeymen Plumbers' Local Union 130, U.A.*, 562 F.3d 784, 790 (7th Cir. 2009) (internal citations and citations omitted); *Griffin v. Foley*, 542 F.3d 209, 217 (7th Cir. 2008) ("[d]istrict court judges, because of the very nature of the duties and responsibilities accompanying their position, possess great authority to manage their caseload.") (citations omitted).

The interest of the Court is to administer justice to the parties on the merits of claims and defenses, and it must do so by limiting the procedural complexities raised by duplicitous motions in the same case, especially based on different operative pleadings. So as to ensure the just and speedy resolution of this case, and to prevent unnecessary duplication of effort, the undersigned will limit the parties to the filing of one motion for summary judgment. That one motion may seek judgment on as many claims or defenses as the case makes appropriate.

Having now allowed the filing of Howell's amended complaint and in light of CSXT's stated intent to request summary judgment on the added claim, the Court DISMISSES WITH LEAVE TO RE-FILE CSXT's motion for summary judgment [DE 40] and DENIES CSXT's motion for summary ruling on the summary judgment motion [DE 46]. The Court believes that any inconvenience imposed on CSXT in having to re-file its motion for summary judgment is minimal given that Howell is merely introducing an alternative theory of exposure under FELA, not an entirely new and independent claim for relief. Any dispositive motion shall be filed no later than Friday, May 3, 2013, and briefing shall proceed in accordance with the Rules. Howell's motion to expedite the ruling on the motion to amend the complaint and reset the summary judgment briefing schedule is GRANTED, as indicated herein [DE 44].

**3.     CSXT's motion to exclude the expert testimony of Dr. Kamal Chaban [DE 27]**

In anticipation of trial, CSXT moved to disqualify Howell's proposed expert witness, Dr. Kamal Chaban, under Fed. R. Evid. 702 and *Daubert* [DE 27, 31]. Dr. Chaban is a pulmonologist of fifteen years, who first started treating Howell on April 29, 2009 and diagnosed him with Reactive Airways Dysfunction Syndrome (RADS), or irritant-induced asthma, resulting from the incident of February 3, 2009. CSXT does not attack Dr. Chaban's qualifications, but instead argues

8

that Dr. Chaban's diagnosis of RADS is scientifically unreliable because according to CSXT's expert, Dr. Alan R. Leff, there are specific diagnostic criteria that must be satisfied in order to make a diagnosis of RADS, and Howell fails to meet the third, sixth, and seventh criteria for a RADS diagnosis. Howell acknowledges that there are specific diagnostic criteria for a RADS diagnosis, but argues that most pulmonologists diagnose RADS even when all of the diagnostic criteria are not strictly met [DE 28]. Howell asserts that Dr. Leff's disagreement with Dr. Chaban's medical opinion goes to the weight of the testimony, not its admissibility. After much consideration, the Court denies CSXT's motion to bar the expert testimony of Dr. Chaban at this time [DE 27].

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and subsequent cases, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, whether scientific or otherwise. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The proponent of expert testimony bears the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *cf. Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (holding that the proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied).

Federal Rule of Evidence 702, as amended in 2000 and 2011 to better reflect the state of the law on the subject, sets out those admissibility requirements. Expert opinions are admissible where:

(1)   The witness is qualified as an expert by knowledge, skill, experience, training, or education (*see* Rule 702 introductory phrase);

9

(2) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue (*see* Rule 702(a));

(3) The testimony is based on sufficient facts or data (*see* Rule 702(b));

(4) The testimony is the product of reliable principles and methods (*see* Rule 702(c)); and

(5) The expert has reliably applied the principles and methods to the facts of the case (*see* Rule 702(d)).

Rule 702 is a conjunctive test, so expert testimony must meet all five requirements to be admissible. Each requirement has been thoroughly explored in the case law, and there is no dispute that Dr. Chaban is qualified as an expert; that his scientific, technical, or other specialized knowledge will help the trier of fact to understand the alleged harm caused to Howell by the incident and is relevant;¹ and, that his testimony is based on sufficient facts or data, including Dr. Chaban's treatment of Howell and review of his medical records. Instead, the only basis CSXT raises for excluding Dr. Chaban's testimony is that Dr. Chaban's diagnosis of RADS is not the product of reliable principles and methods reliably applied to the facts of the case.²

The fourth and final requirements of Rule 702, as previously noted, are that the testimony must be the product of reliable principles and methods, *see* Rule 702(c), and the expert must reliably apply sound scientific principles and methods to the facts of the case, *see* rule 702(d). These

---

¹An expert's testimony must not only be deemed reliable, but it must also be relevant. Relevancy means that the testimony is likely to assist the trier of fact to understand the evidence or determine a fact in issue. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) ("in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case").

²To be clear, in the present motion, CSXT does not challenge the causation of Howell's alleged health problems resulting from the incident. Rather, CSXT challenges only the diagnosis—that is, the conclusion that Howell specifically suffers from RADS—because according to CSXT, there is no objective evidence that supports Howell's subjective complaints [DE 27]. *See e.g., Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F.Supp.2d 791, 804 (E.D. Wis. 2010) (noting that there are two distinct aspects of any testimony from a medical expert on exposure causation: (1) an expert's opinion on diagnosis of the specific ailment; and (2) an expert's opinion on external causation for the specific ailment) (citing Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony*, Reference Manual on Scientific Evidence 472 (2d ed. 2000)).

requirements directly derived from the Supreme Court's decision in *Daubert*, and are intended to guarantee that the principles and methods which the proposed expert relies are independently scientifically reliable. "A 'principle' is a theory that can be used to explain the meaning of observations." FED. PRAC. & PROC. § 6266. "While 'principle' refers to the theories an expert employs to explain observed facts, 'method' refers to how the expert derives those theories." *Id*.

Relative to the application of the principles and methods to the facts, the Court assesses the manner in which the expert has attempted to bring it all together; the question is whether he has "bridged the analytical gap" between the mere existence of his principles in theory and his invocation of them on the specific facts of the case. *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005), partially vacated on unrelated grounds, 448 F.3d 936; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (citation omitted).

In addition to the non-exhaustive *Daubert* factors already mentioned, courts have found additional factors to be particularly relevant to this analysis:

(1) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See Gen. Elec. Co.*, 522 U.S. at 146.

(2) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

(3) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

While *Daubert* and subsequent cases have laid out a variety of factors which often prove helpful in assessing a principle's scientific reliability, the inquiry is necessarily fact-dependent and flexible. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). Finally, as always in the Rule 702 analysis,

the court is free to consider concerns specific to the facts of the case at hand. In this case, CSXT's challenge goes only to Dr. Chaban's conclusion that Howell suffers from RADS given the diagnostic criteria for the diagnosis.

RADS was first named and described in an academic article, based on a study of 500 asthma patients, that was published in 1985. *See Noffsinger v. Valspar Corp.*, No. 09 C 916, 2012 WL 895496, *1-2 (N.D. Ill. Mar. 15, 2012) (citing Stuart M. Brooks, Mark A. Weiss & I.L. Bernstein, *Reactive Airways Dysfunction Syndrome: Persistent Asthma Syndrome After High Level Irritant Exposures*, 88 Chest 376 (Sept. 1985)). Based on the examinations of those patients, the authors arrived at eight criteria for diagnosing RADS:

1. A documented absence of respiratory complaints.
2. The onset of symptoms occurred after a single specific exposure or accident.
3. The exposure was to a gas, smoke, fume, or vapor present in a very high concentration and which had irritant qualities.
4. The onset of symptoms occurred within 24 hours after the exposure and persisted for at least 3 months.
5. Symptoms simulated asthma with cough, wheezing, and dyspnea predominating.
6. Pulmonary function tests may show airflow obstruction.
7. Methacholine challenge testing was positive.
8. Other types of pulmonary disease were ruled out.

*Id.*

CSXT claims that because Howell did not meet the third, sixth, and seventh criterion for a correct diagnosis, Dr. Chaban's testimony is not scientifically reliable.

Relative to the third criteria, Howell does not dispute that exposure to an irritant vapor, gas, fumes, or smoke in very high concentrations is one of the diagnostic criteria for RADS. CSXT argues that Howell's failure to establish this criteria prevents Howell from being diagnosed with RADS—but, it does so knowing all too well that there is no evidence in this case establishing precisely where the fumes actually came from or for how long Howell was exposed to it. The fume

exposure was indeed accidental and the recording of concentrations was not possible. Thus, even considering Howell's medical records which indicate that Howell reported an exposure lasting for only thirty seconds, it is impossible to quantify the magnitude of the irritant exposure at this time given its unknown origin. And the record indicates that Howell became immediately ill after the exposure, was taken to the emergency room as a result, and thereafter suffered asthma-like symptoms without his having a history of pre-existing breathing problems.

The goal of *Daubert* is to assure that experts employ the same intellectual rigor in their courtroom testimony as would be employed by an expert in the relevant field, and CSXT offers no medical literature indicating that an expert in the RADS field would need to do more than what Howell's expert offered here.[3] *See Noffsinger*, 2012 WL 895496, *5 (finding the fact that the experts did not purport to have defined a level of plaintiff's exposure does not render their testimony inadmissible). Because a precise level of exposure to an irritant is not part of the medical diagnosis of RADS, the fact that Dr. Chaban did not define the level of Howell's exposure does not render his testimony inadmissible. *See Noffsinger*, 2012 WL 895496, *5; *see also Sunnycalb v. CSX Transp., Inc.*, No. 1:10-cv-192-HJW, 2012 WL 3308992, *4-6 (S.D. Ohio Aug. 13, 2012) (involving a sudden unexpected chemical exposure which could not be measured after-the-fact and holding that although CSXT argues that there is no evidence that plaintiff's exposure was of sufficient concentration to cause RADS, the case law does not require a determination of the precise level of exposure in sudden accident situations) (citations omitted). Thus, because evidence of the precise level of chemical exposure is not necessary for an expert to reliably indicate that the sudden

---

[3] In fact, Dr. Chaban testified that there is not a strict criteria for the amount of the exposure, but it is usually an unusual heavy exposure—one that could last for as few as five minutes [DE 28-1 at 4].

exposure caused RADS, the Court does not believe that exclusion of the testimony on this basis is proper.

The sixth and seventh criteria concern the contents of Howell's medical records. These diagnostic criteria indicate the need to have a pulmonary function test (PFT) that shows airflow obstruction and a positive methacholine challenge. It is undisputed that the two PFT tests performed on Howell in March 27 and June 8, 2009 indicated a primary restrictive impairment and a mild airway obstruction, respectively. Dr. Chaban testified that after considering 'patient effort' in performing the tests, he interpreted these tests as showing obstruction consistent with RADS [DE 28-1 at 6-8, 15]. However, Dr. Leff interpreted the test results as being inconsistent with RADS because it was his opinion that Howell did not adequately perform the tests [DE 27-3 at 4]. This essentially amounts to a battle of the parties' experts. The Court agrees with Howell that the difference of opinion is better left for a jury to consider.

It is also undisputed that Howell never had a positive methacholine challenge test. Yet CSXT's expert, Dr. Leff, agrees with Dr. Chaban that the explanation for the negative test result may be on account of the fact that Howell was being treated with high dose steroids which suppresses hyperactivity [DE 28-1 at 5-6; DE 27-3 at 4]. Thus, the lack of a positive methacholine challenge test does not necessarily rule out RADS, *id.*, and is therefore not a basis for the exclusion of Dr. Chaban's testimony.

The record also reflects that Dr. Chaban testified to ruling out other possible causes of Howell's symptoms, such as acute lung injury, acid reflux caused by sleep apnea, interstitial disease, bronchiolitis obliterans, and pneumonia, and ultimately he concluded that Howell's symptoms were indicative of RADS [DE 28-1 at 4, 9, 14]. Dr. Chaban admitted that he could not rule out the

possibility of "secondary gain" or malingering, because RADS is a somewhat unpredictable and fairly rare diagnosis; however, he continued to treat Howell for RADS because he believed that Howell was in fact suffering from RADS [DE 28-1 at 11, 13-16].

The very limited grounds that CSXT raises for the exclusion of Dr. Chaban's testimony are grounds for cross-examination, not wholesale disqualification of the witness. The case upon which CSXT relies, *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F.Supp.2d 791, 804 (E.D. Wis. 2010), does not change the Court's determination. While the district court in *Lemmermann* did not permit plaintiff's expert to testify that the plaintiff was afflicted with RADS due to an exposure of fumes, the facts of *Lemmermann* are readily distinguished from Howell's case. In *Lemmermann*, the expert was "completely unaware" of the plaintiff's prior history of asthma and allergies, and in fact, during her appointment with the expert, the plaintiff falsely "denied [having] any previous respiratory problems." *Id*. at 793-94, 803-04. In *Lemmermann*, the parties also did not dispute that a diagnosis of RADS was not permissible where there was no documented absence of pre-exposure respiratory complaints and no onset of asthma symptoms occurring within 24 hours after the exposure. *Id*. at 805. Moreover, the expert in *Lemmermann* did not observe any evidence of obstruction in any of the plaintiff's PFT's and did not attempt to account for obvious alternative explanations for the plaintiff's symptoms. *Id*. at 804, 806. None of these facts, which served as the basis for excluding the expert's testimony in *Lemmermann*, are found in the present case. And CSXT's primary complaint—that the objective medical findings do not support a diagnosis of RADS—does not necessarily bar the diagnosis of RADS, especially where the test results have different reasoned interpretations.

The Court finds that at this stage of the proceedings, Dr. Chaban is a qualified expert proposing to testify based on specialized knowledge, skill, experience, training, and education that will assist the trier of fact in understanding or determining a fact in issue. In addition, his opinion is based upon sufficient facts and data, and appears to be a product of reliable principles and methods applied reliably. Furthermore, the Court does not believe that the probative value of such testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

On the present record, the Court intends to allow Dr. Chaban to testify as an expert with respect to his conclusions, including his diagnosis that the February 3, 2009 incident caused RADS. However, should CSXT want to present further argument on this issue closer to trial, then the Court would be willing to reconsider whether Dr. Chaban's testimony meets the standards set out in *Daubert* and Rule 702 of the Federal Rules of Evidence.

For the reasons stated herein, CSXT's motion to exclude the expert testimony of Dr. Kamal Chaban is DENIED with permission to re-file prior to the admission of Dr. Kamal's testimony at trial [DE 27]. And as previously indicated, Plaintiff's motion to amend the complaint [DE 37] is GRANTED and motion to expedite the ruling on said motion [DE 44] is GRANTED. Plaintiff shall file his amended complaint [DE 37-1] as a separate document within 10 days of this order. The Court DISMISSES WITH LEAVE TO RE-FILE CSXT's motion for summary judgment [DE 40] and DENIES CSXT's motion for summary ruling on the summary judgment motion [DE 46]. The Court SETS a dispositive motion deadline of Friday, May 3, 2013, with each party allowed to file only one summary judgment motion on any and all claims/defenses.

SO ORDERED.

ENTERED: March 18, 2013

/s/ JON E. DEGUILIO
Judge
United States District Court