UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| NICHOLAS HOWELL, | ) |
| :--- | :--- |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:11-CV-079 JD |
| | ) |
| CSX TRANSPORTATION, INC, | ) |
| | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

This case arises out of injuries that the plaintiff, Nicholas Howell, allegedly sustained due to his inhalation of unidentified fumes while working as a switchman for the defendant, CSX Transportation, Inc. ("CSXT"). Mr. Howell asserted a claim under the Federal Employers' Liability Act (FELA), 34 U.S.C. § 51 *et seq.* based on those injuries, and CSXT has now moved for summary judgment [DE 53]. This motion has been fully briefed [DE 54, 57, 63]. Because the record reflects substantial factual disputes as to whether Mr. Howell suffered injuries on account of CSXT's negligence, the motion for summary judgment must be denied.

### **I. Factual Background**

CSX Transportation, Inc. is a railroad corporation that owns and operates trains, train cars, and rail yards. [DE 50 ¶¶ 4–6; DE 57-4 p. 2]. On February 3, 2009, Mr. Howell was employed as conductor/remote control operator at CSXT's rail yard in Willard, Ohio. [DE 50 ¶ 7]. During his shift on that date, Mr. Howell was working as the switchman on a "two-man remote" job. [DE 57-1 p. 4]. He was partnered with Brian Holman, who was acting as the foreman for the team, and their task was to maneuver rail cars throughout the yard and assemble trains as assigned by the yardmaster. [DE 57-1 pp. 4–5; 57-2 pp. 2–3].

At approximately 10:15 p.m., Mr. Howell was operating a locomotive westward towards the location of his next assignment, while Mr. Holman was waiting in the "eastbound hump shanty." [DE 57-1 p. 6, 57-2 p. 4]. Mr. Howell was standing outside of the cab of the locomotive on the front platform, operating it by remote control, when he was suddenly overwhelmed by fumes. [DE 57-1 p. 6]. He was hit by a cloud or "dew-ish mist" that had a "sulfur-ish, metal-ish smell." [DE 57-1 pp. 10–11]. He began gasping for air and felt like he was drowning. [DE 57-1 p. 10]. His heart began to race and his eyes were burning, and he started vomiting. [DE 57-1 pp. 9–11]. Mr. Howell brought the locomotive to a stop and ran into the cab, then left the locomotive and ran towards a nearby road. [DE 57-1 pp. 6–10]. Mr. Howell then radioed for help. [DE 57-1 p. 8]. Rich Capelle, the trainmaster, asked Mr. Howell for his location and was the first person to reach him. [DE 57-1 pp. 7–10]. Mr. Capelle arrived at the scene and found Mr. Howell by a guardrail next to the road, still vomiting and gasping for air. [DE 57-1 pp. 8–9]. When Mr. Holman arrived several minutes later, Mr. Capelle instructed him to secure the locomotive, and Mr. Capelle then drove Mr. Howell to the emergency room. [DE 57-1 p. 10].

In order to secure the locomotive, Mr. Holman applied the brakes and opened the cab of the locomotive to let it air out for a minute. [DE 57-2 p. 5]. He then entered the cab and took the locomotive out of remote-control mode. [DE 57-2 p. 5]. Mr. Holman did not smell anything unusual outside of the cab, but when he entered the cab he smelled "burnt wire" and then began to notice a metallic taste in his mouth. [DE 57-2 pp. 5–7]. Mr. Holman reported the metallic taste to Nicholas Male, the terminal superintendent who had been called to the scene, and Mr. Male directed Mr. Holman to go to the hospital for evaluation. [DE 57-2 p. 5]. Mr. Holman did not become ill, and was released from the hospital after taking oxygen for about an hour. [DE 57-2 p. 6].

2

Mr. Male arrived at the locomotive around the time Mr. Capelle and Mr. Howell left for the emergency room. [DE 57-4 p. 9]. As the terminal superintendent, Mr. Male was responsible for determining if any hazards existed and for safeguarding his employees and the public from any hazardous conditions. [DE 57-4 pp. 3, 18]. He was also a "hazmat sentinel," meaning he had received special training on identifying and responding to hazardous material incidents. [DE 57-4 p. 3]. Upon arriving at the scene, Mr. Male approached the locomotive to visually inspect it and smell for any unusual odors. [DE 57-4 p. 10]. He then mounted the locomotive and entered the cab. [DE 57-4 p. 10]. However, he did not notice or smell anything unusual. [DE 57-4 pp. 9–10]. Though he was unable to conclude what the smell or fumes were or what caused them, he concluded that they had come from the locomotive itself. [DE 57-4 pp. 9–11]. Nothing caused him to suspect or investigate any potential source of the fumes other than the locomotive. [DE 57-4 pp. 11–12, 14].

Mr. Howell was treated at the hospital overnight and was released the following morning. [DE 57-1 p. 31]. He was able to report to work that day, but he was still having difficulty breathing and complained that his chest hurt. [DE 57-2 p. 6]. He has continued to experience respiratory problems since the incident, and has been diagnosed with Reactive Airway Dysfunction Syndrome ("RADS"), an irritant-induced asthma typically caused by exposure to high concentrations of chemical fumes. [57-3 pp. 1–2]. Although about half of individuals who experience RADS recover fully within three months, the condition can last for longer periods and can also become chronic. [DE 57-3 p. 2]. Because Mr. Howell has suffered from RADS for several years, he is likely to experience the condition throughout his life. [DE 57-3 p. 3].

## II. Standard of Review

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. On the other hand, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in its favor. *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. Discussion

Enacted in 1908 to shift the burden of the "human overhead" in the notoriously dangerous railroad industry from the railroad workers to their employers, the Federal Employees' Liability Act ("FELA" or the "Act"), 45 U.S.C. § 51 *et seq.*, provides railroad employees with a cause of action against their employers for injuries attributable to their employers' negligence. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994); *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 431 (1958). The Act states:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. In interpreting the Act, the Supreme Court has "liberally construed FELA to further Congress' remedial goal." *Gottshall*, 512 U.S. at 543. As the Court has clarified, however, "[t]hat FELA is to be liberally construed . . . does not mean that it is a workers' compensation statute. . . . 'The basis of [an employer's] liability is [its] negligence, not the fact that injuries occur.'" *Id.* (quoting *Ellis v. Union Pac. R. Co.*, 329 U.S. 649, 653 (1947)).

Liability under the Act is "founded on common law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." *Id.* (quoting *Urie v. Thompson*, 337 U.S. 163, 182 (1949)). Those qualifications include the modification or abrogation of traditional defenses such as contributory negligence, assumption of risk, and the fellow servant rule. *Id.* at 542–44. In addition to limiting these defenses to employees' claims, Congress also eased employees' burdens of establishing negligence in several respects. First, the Supreme Court has held that "a relaxed standard of causation applies under FELA." *Id.* at 543. The standard is simply whether an employer's negligence "played any part, even the slightest, in

5

producing the injury or death for which damages are sought." *Id.* (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1994)); *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011) (noting that "FELA's language on causation . . . is as broad as could be framed"). In addition, Congress has provided several avenues for establishing negligence *per se* for injuries related to violations of railroad companies' statutory duties.

Specifically, railroads are strictly liable for injuries resulting from violations of the Safety Appliance Act or Locomotive Inspection Act: "[I]t clearly is the legislative intent to treat a violation of the Safety Appliance Act as 'negligence,'—what is sometimes called negligence per se." *Urie*, 337 U.S. at 189 (quoting *San Antonio & A.P.R. Co. v. Wagner*, 241 U.S. 476, 484 (1916)) (noting also that the "congressional purpose underlying the [Locomotive] Inspection Act is basically the same as that underlying the Safety Appliance Acts and the Employers' Liability Act"). The Safety Appliance Act prohibits the use of train cars or locomotives unless equipped with certain functioning safety features, including "couplers coupling automatically by impact," "secure sill steps and efficient hand brakes," and "secure ladders and running boards." 49 U.S.C. § 20302. The Locomotive Inspection Act, in turn, permits the use of a locomotive "only when the locomotive or tender and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. The failure of a railroad to comply with any of these specifications constitutes negligence as a matter of law, obviating the need in those circumstances to show actual negligence on the part of the railroad.

Mr. Howell has pursued two avenues for establishing negligence under FELA. Mr. Howell first seeks to establish negligence on the part of the railroad under common law standards through the doctrine of *res ipsa loquitur*. Under this theory, Mr. Howell argues that because locomotives should not release hazardous fumes in their ordinary course of operation

6

absent some sort of negligence, the simple fact that the incident occurred permits an inference of negligence. Second, Mr. Howell argues that CSXT violated the Locomotive Inspection Act because the locomotive he was operating at the time of his injury was not in proper condition and safe to operate without unnecessary danger of personal injury, thus amounting to negligence per se.[1] Because there are genuine issues of material facts as to both theories, summary judgment is inappropriate and the defendant's motion must be denied.

### A. Negligence Under the Doctrine of *Res Ipsa Loquitur*

Mr. Howell has produced sufficient facts to permit an inference of negligence by CSXT under the doctrine of *res ipsa loquitur*. The Supreme Court has defined *res ipsa loquitur* as follows:

> When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such, as in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care.

*Jesionowski v. Boston & M. R.R.*, 329 U.S. 452, 456 (1947) (quoting *San Juan Light & Transit Co v. Requena*, 224 U.S. 89, 98–99 (1912)). In describing its effect in establishing negligence, the Court has clarified that *res ipsa loquitur* "means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient." *Id.* (quoting *Sweeney v. Erving*, 228 U.S. 233, 240 (1914)). In applying this doctrine, courts typically look to three factors:

---

[1] In his complaint and in his response to summary judgment, Mr. Howell also referenced the Safety Appliance Act, 49 U.S.C. § 20302. However, he did not provide any argument as to violations of that act or suggest that any of the components regulated by the act failed to perform properly or had anything to do with his injuries. The Court therefore construes Mr. Howell as pursuing his FELA claim only through traditional negligence principles and through the Locomotive Inspection Act.

> (1) The injury for which the plaintiff seeks recovery must be of a kind that ordinarily does not occur in the absence of negligence; (2) the injury must have been caused by some agency or instrumentality within the exclusive control of the defendant; and (3) the injury must not have been due to any contribution or voluntary activity on the part of the plaintiff.

*Robinson v. Burlington N. R. Co.*, 131 F.3d 648, 652 (7th Cir. 1997) (quoting *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 836–37 (4th Cir. 1987)). As the Supreme Court has cautioned, however, the doctrine is not to be rigidly applied, but evaluated with an eye towards "whether the circumstances were such as to justify a finding that [the incident] was a result of the defendant's negligence." *Jesionowski*, 329 U.S. at 457.

Mr. Howell has produced sufficient evidence to create a jury question as to this issue. CSXT does not contest that this type of incident ordinarily does not occur in the absence of negligence, and does not suggest that Mr. Howell's injuries were due in any way to his own actions. CSXT argues, however, that because the source of the fumes is unclear, and because the fumes may have come from rail cars passing through its yard instead of from the locomotive, Mr. Howell is unable to establish the second element for invoking *res ipsa loquitur*—that the source of the fumes was in CSXT's exclusive control. Initially, CSXT is correct in arguing that if the leak came from a rail car and not the locomotive, *res ipsa loquitur* would be inapplicable since the cars themselves are not necessarily within CSXT's exclusive control. *See Borger v. CSX Transp., Inc.*, 571 F.3d 559, 566 (6th Cir. 2009) ("[A]ssuming that a leak [in a rail car] could be evidence of some person's negligence, it does not follow that it is evidence of CSX's negligence."). However, CSXT's argument fails because there is ample evidence from which a jury could conclude that the locomotive, and not a rail car, was the source of the fumes.

Both Mr. Male and Mr. Holman expressly testified that they believed the locomotive was the source of the fumes. [DE 57-2 pp. 7–8, 57-4 pp. 11, 14–15]. In addition, as the hazmat

8

sentinel and terminal superintendent, Mr. Male had an obligation to identify and report any hazardous material leaks, and nothing at the scene led him to even suspect that anything other than the locomotive had caused the fumes. [DE 57-4 p. 3, 9–12, 14]. Mr. Holman also noticed a metallic taste in his mouth only after entering the cab of the locomotive, which is consistent with the metallic smell of the fumes Mr. Howell encountered, also on the locomotive. [DE 57-1 pp. 10–11, 57-2 p. 5]. Additionally, the crew working adjacent to Mr. Howell did not report any fumes or hazardous material leaks, nor did the car inspectors walking along the tracks. [DE 57-4 p. 12].

In its reply brief, CSXT attempts to negate these facts by producing an affidavit from Mr. Male in which he recants his testimony that the fumes came from the locomotive. [DE 63-1]. In his affidavit, Mr. Male explains that now that he has read the transcripts of Mr. Howell and Mr. Holman's depositions, he believes his prior testimony was misinformed since he previously thought Mr. Howell was inside the cab during his exposure. [DE 63-1 ¶¶ 3–7]. Based on his new understanding of the facts, he now believes that the fumes Mr. Howell encountered had nothing to do with the locomotive. [DE 63-1 ¶ 8].

There are several reasons why this is an insufficient basis for granting summary judgment, however. The first is that it is procedurally improper; by waiting until its reply brief to present these facts, CSXT denied Mr. Howell the opportunity to respond to them. Second, there are sufficient facts aside from the conclusion Mr. Male expressed at his deposition that would suffice to defeat summary judgment. Mr. Holman also testified that he believed the locomotive was the source of the fumes, and even if Mr. Male has since changed his mind, his conduct at the scene of the incident is consistent with the locomotive being the source. [DE 57-2 p. 8, 57-4 p. 12 ("As a hazmat sentinel, I felt that if there was anything in the yard at that time, I would have

9

done more.")]. Mr. Male had an obligation to ensure the safety of his employees, not to mention himself, and he testified that at the time of his investigation he had no reason to believe that anything other than the locomotive was the source of the fumes. [DE 57-4 pp. 12, 14–15]. Additionally, there were no reports of any incidents that night except on the locomotive. [DE 57-4 pp. 11–12, 14–15].

Most importantly, Mr. Male's affidavit recanting his deposition testimony does not nullify his deposition testimony or prevent the Court from considering it at summary judgment. The affidavit merely goes to the weight and credibility of his prior testimony, which is a question for the jury and not the Court. True, a jury could reasonably believe Mr. Male's new explanation and agree that his prior conclusion was simply based on faulty assumptions, in which case they may find for CSXT. However, a jury would also be justified in reaching the opposite conclusion. Mr. Male had personally investigated the incident immediately after it occurred, and from that time at least through his deposition, two and a half years later, he believed that the source of the fumes was the locomotive. His change of heart came over four and a half years after the incident and in the midst of litigation. On that basis, a reasonable juror could discount Mr. Male's newly-formed conclusion and credit his prior belief that the fumes came from the locomotive.

If Mr. Male's conclusion in his deposition testimony had been expressly conditioned on the existence of certain facts for which there is no evidence at this point, or had been posed as a hypothetical assuming the existence of such facts, the analysis might be different. That is not the case, however. Though his conclusion may have been based in part on his understanding that Mr. Howell was in the cab at the time of his exposure, he stated at other times that his conclusion was based on the metallic smell and the fact that no other employees reported encountering fumes. [DE 57-4 pp. 12]. He had also personally investigated the scene of the incident shortly after it

occurred, and he testified unequivocally that the fumes came from the locomotive, so it will be up to the jury to consider the basis and credibility of his prior testimony.

CSXT argues briefly in a footnote that Mr. Male's affidavit "should be considered by the Court" because he has offered a "'plausible explanation' for the substantive change from his prior deposition testimony." [DE 63 p. 3 n.3 (quoting *Cowan v. Prudential Ins. Co of Am.*, 141 F.3d 751, 756 (7th Cir. 1998))]. However, the question here is not whether the Court should consider the affidavit, but whether it should *not consider* the deposition testimony. In this procedural posture, where the Court's only inquiry is whether there is evidence from which a jury could find for the non-movant, it is inconsequential whether the Court also considers evidence supporting the movant as to those issues. Mr. Male's deposition testimony supported Mr. Howell, so considering his contradictory affidavit in support of CSXT would only deepen the factual dispute, not negate it. In either case, summary judgment would be unwarranted. That fundamentally distinguishes this case from those CSXT relies on in which a party opposing summary judgment offers an affidavit contradicting their prior testimony in an effort to create, rather than avoid, an issue of fact, rendering those cases inapposite. Thus, though the Court considers the affidavit, it has also considered the deposition testimony as well.

CSXT raises several other factual arguments, but none of them is sufficient to warrant summary judgment. CSXT argues that the fumes could not have possibly come from the locomotive since Mr. Howell was standing on the front end of the locomotive traveling in a westward direction, while the wind was heading towards the south, meaning it would be blowing the fumes away from Mr. Howell.[2] However, there is no evidence indicating the speed of the wind or the locomotive, or the force with which the fumes may have been emitted, so Mr.

---

[2] There is actually a dispute as to the direction of the wind, as Mr. Male testified that it was heading northeast, but CSXT's argument would presumably stay the same under that scenario as well.

Howell's position on the locomotive and the wind direction do not render it an impossibility that the fumes came from the locomotive. CSXT also argues that because the door of the cab was closed when Mr. Holman arrived at the scene, the fumes Mr. Howell encountered while standing on the front of the locomotive could not have come from the cab. However, there is no evidence as to whether the door was open at the time of Mr. Howell's exposure to the fumes, which would be the appropriate inquiry. Mr. Howell testified that he entered the cab after his initial exposure, meaning he must have closed the door when he exited the cab for Mr. Holman to have found it that way. That the door was closed when Mr. Holman reached the train sheds no light on whether the door was open or closed during Mr. Howell's exposure to the fumes. Additionally, there is no basis to conclude on this record that the fumes must have come from the cab as opposed to other parts of the locomotive, or that the fumes could not have escaped the cab if the door had been closed, so this is not a basis for granting summary judgment either.

In conclusion, Mr. Howell has produced sufficient facts from which a jury could draw an inference that CSXT was negligent. A jury could reasonably find that the fumes indeed came from the locomotive. If it so finds, the jury could also conclude that because such fumes should not occur in the ordinary course of the locomotive's operation, and because the locomotive was in CSXT's exclusive control and Mr. Howell was not at fault for the incident, the incident occurred due to CSXT's negligence. Additionally, Mr. Howell has amply discharged his burden of showing causation, as his treating physician expressly testified that he believed that Mr. Howell's exposure to the fumes caused his respiratory condition. Therefore, because a rational jury could find in favor of Mr. Howell on this claim, summary judgment must be denied.

## B. Negligence Through Violation of the Locomotive Inspection Act

Mr. Howell has similarly produced sufficient facts to permit the conclusion that CSXT violated the Locomotive Inspection Act, thus constituting negligence per se for the purposes of the Federal Employees' Liability Act. The Locomotive Inspection Act imposes on railroads "'an absolute and continuing duty' to provide safe equipment." *Urie*, 337 U.S. at 188 (quoting *Lilly v. Grand Trunk W. R. Co.*, 317 U.S. 481, 485 (1943)). To prevail on a claim based on a violation of the Locomotive Inspection Act, a plaintiff must only demonstrate that the act was violated and that the violation caused the injuries. *Weber v. BNSF Ry. Co.*, 261 P.3d 984, 990 (Mont. 2011). Such a violation constitutes "negligence as a matter of law," dispensing "with the necessity of proving that violations of the safety statutes constitute negligence." *Urie*, 337 U.S. at 189.

Specifically, a plaintiff must only show that the locomotive in question is not "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. A plaintiff need not identify a specific defect in order to establish a violation of this provision; rather, a jury is entitled to find a violation "if there is proof that the mechanism failed to work efficiently and properly even though it worked efficiently both before and after the occasion in question. The test in fact is the performance of the appliance." *Myers v. Reading Co.*, 331 U.S. 477, 483 (1947) (quoting *Spotts v. Baltimore & O.R. Co.*, 102 F.2d 160, 162 (7th Cir. 1938)) (discussing the Safety Appliance Act); *Weber*, 261 P.3d at 991 (applying the analysis in *Myers* to the Locomotive Inspection Act).

There are ample facts here from which a jury could conclude that the locomotive in question was not "in proper condition and safe to operate without unnecessary danger of personal injury." As discussed at more length *supra*, though it is uncertain exactly where the fumes came from, there is evidence from which a jury could find that they came from the locomotive. Should

13

the jury find that to be the case, it could easily conclude that a locomotive that emits hazardous fumes such that its operator is overcome and suffers respiratory illness violates this requirement. A locomotive that emits such fumes is certainly not in proper condition or safe to operate, which CSXT has not denied, and it would then be up to the jury to consider whether the resulting danger of personal injury was unnecessary. Because factual disputes abound as to each of these questions, Mr. Howell is entitled to present his case to a jury, and summary judgment must be denied.

### IV. Conclusion

For these reasons, CSXT's motion for summary judgment [DE 53] is DENIED.

SO ORDERED.

ENTERED:  November 21, 2013 

                                                /s/ JON E. DEGUILIO  
                                                Judge  
                                                United States District Court